Theresa McINNES, Plaintiff–Appellant,

v.

STATE OF CALIFORNIA, California Department of Consumer Affairs, Defendants–Appellees.

No. 89–16242.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1991.

Decided Aug. 28, 1991.

James B. Macy, Sacramento, Cal., for plaintiff-appellant.

Ronald W. Beals, Sacramento, Cal., for defendants-appellees.

Before FLETCHER, NORRIS and TROTT, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiff Theresa McInnes appeals from the district court's adverse grant of summary judgment in her Title VII employment discrimination suit against the State of California and the California Department of Consumer Affairs ("DCA"). The district court held, based on issue preclusion, that McInnes's suit was barred by a prior decision of the California State Personnel Board ("SPB") awarding McInnes damages and other remedies for the same discrimination alleged in her federal complaint. Because unreviewed state administrative decisions lack preclusive effect in subsequent Title VII actions, we reverse.

## FACTS

The present suit is but one skirmish in an ongoing battle between McInnes and her government employers over sexual harassment and discrimination. McInnes commenced her employment with the government of California in 1978, when she joined

the California Department of Justice ("DOJ") as an Associate Governmental Program Analyst. Three years later she filed a complaint with the DOJ, alleging that her supervisors and co-workers had harassed and discriminated against her because of her gender. In June of 1984, McInnes and the DOJ entered into a stipulated settlement of her complaint. The settlement awarded McInnes damages, vacation and sick-leave credits, retirement fund contributions, and partial disability status for gastrointestinal problems that arose during her dispute with the DOJ. The settlement also required the DOJ to help place McInnes in the position of Senior Special Investigator with the Division of Investigation of the DCA and provide her with the necessary peace officer training ("POST Training") through a training and development assignment. Following that assignment and a probationary period at the DCA, McInnes would be entitled to apply for employment with or transfer to the DOJ as either a Supervising Special Investigator I or as a Special Agent.[1] Pursuant to the settlement, in July of 1984 McInnes was placed in the Sacramento District Office of the DCA's Division of Investigation for her training and development assignment.

The DCA assigned McInnes to work under the immediate supervision of Reuben Dennis, a Supervising Special Investigator I in the Sacramento Office with a history of hostile and discriminatory treatment of women investigators. Dennis treated McInnes no better than he had treated other women under his supervision. During McInnes's orientation, Dennis harassed her about her financial affairs, which had fallen into some disarray because of her health problems. He told her that her credit problems would prevent her from successfully completing her training. He also berated her like a would-be drill sergeant, repeatedly referring to her as "no good" and "useless" and then criticizing her response to these disparagements as "emotional." SPB Decision, No. 20342, at 14–16 (Sept. 3, 1986). In comments representative of his hostile attitude toward McInnes, Dennis said to her at one point:

> I'll tell you frankly that if it had been up to me, I wouldn't have hired you. You're no good to anybody. You are emotionally unable to do your job. You've gotta straighten out your life, lady. And the way you reacted the other day [in a meeting regarding her financial situation], you did not handle that well at all emotionally. People who break out in tears are useless!

*Id.* at 15. McInnes had no such troubles with other superiors and colleagues at the DCA. Indeed, another male inspector with whom she worked found her "to be very attentive and receptive to instruction, a quick learner, well balanced emotionally, and very professional." *Id.* at 17.

Unwilling to tolerate Dennis's abuse, McInnes complained to Michael Vega, the Assistant Chief of the DCA's Division of Investigation. Vega discussed the com-

---

1. The relevant portions of the settlement read:
  2. The respondent, Department of Justice, will assist in the placement of the complainant, Theresa McInnes, in the position of Senior Special Investigator with the Division of Investigation, Department of Consumer Affairs, Sacramento, California, at ... a salary comparable to that which complainant is receiving as an Associate Governmental Program Analyst in the Department of Justice, effective July 1, 1984. Complainant will be provided department-paid POST Training sufficient to qualify her in this peace officer position. During the POST Training, complainant will be on a training and development assignment, at the conclusion of which complainant will begin her probationary period as a Senior Special Investigator with the Division of Investigation.

  3. At the conclusion of her probationary period as a Senior Special Investigator with the Division of Investigation, complainant may apply for employment with (or transfer to) the Department of Justice either as a Supervising Special Investigator I or as a Special Agent at a salary level which is the highest under applicable laws and rules. Complainant's employment application shall be considered by the respondent department in good faith based upon complainant's work performance as a Senior Special Investigator of the Division of Investigation. To the fullest extent possible, the respondent department will disregard those incidents and events which culminated in complainant's present discrimination complaint against the respondent department.

plaint with Chief Duane Lowe, who then initiated a formal internal affairs investigation into Dennis's conduct. On August 8, 1984, McInnes gave Vega a written complaint that was labeled "rough draft" and was addressed to the SPB, the agency responsible for enforcing California's civil service laws. The DCA immediately called off its internal investigation of Dennis and began a comprehensive review of McInnes's attendance record, which included several authorized work absences necessitated by her recurring gastrointestinal problems. Her health worsened, causing her to miss several weeks of work. During this absence from work, the DCA notified her that it was terminating her training and development assignment.

*The SPB Proceedings*

On August 27, 1984, McInnes filed a formal complaint of discrimination with the SPB. An SPB executive officer first ruled against her, but upon McInnes's appeal, an SPB Administrative Law Judge ("ALJ") held evidentiary hearings and ruled in her favor. The ALJ's ruling, adopted by the SPB on September 3, 1986, found that Dennis had harassed and discriminated against McInnes on the basis of her gender and that the DCA had terminated her in retaliation for the "rough draft" complaint she had shown to Vega. The ALJ ordered the DCA to cease and desist its discriminatory and retaliatory conduct, report to the SPB all complaints of sex discrimination and harassment by employees of the Division of Investigation for the next three years, and require supervisors and managers within the Division to undergo training on avoiding and preventing sex discrimination and harassment. To compensate McInnes, the ALJ ordered the DCA to restore her vacation and sick leave, reimburse her for out-of-pocket medical expenses incurred as a result of her gastrointestinal illness, and pay her $10,000 in compensatory damages. Finally, the ALJ's order required the DCA to offer McInnes "a new training and development assignment under the same terms and conditions previously provided in her agreement with the Department of Justice." SPB Decision, No. 20342, at 40 (Sept. 3, 1986). The ALJ rejected McInnes's request for attorney's fees on the ground that there was no "statutory or decisional authority authorizing the Board to make such an award." *Id.* at 38.

Despite the mandate of the ALJ's order, the parties were unable to agree on a new training and development assignment. In January of 1987, McInnes filed with the ALJ a request for modification of the SPB's decision. McInnes requested, among other things, "[a]ppointment to the classification of Special Agent, C Range, Department of Justice, effective December 16, 1985," and "[i]mmediate placement into the position of Special Agent, C Range or higher, as a peace officer, at the DOJ, in either the Bureau of Investigation or the Bureau of Organized Crime and Criminal Intelligence, assigned in Sacramento." She specifically stated that she did not want the modification to include "any assignment on a training and development (T & D) basis."

The ALJ solicited the views of the DOJ and the DCA, both of which opposed her request. The DOJ argued that the modification would put McInnes in a better position than she would have been under the original 1984 settlement, while the DCA claimed that it had fully complied with its obligations under the ALJ's order by offering her several training and development assignments, all of which she rejected. In a ruling adopted by the SPB on October 6, 1987, the ALJ denied McInnes's modification request, agreeing with the positions of both the DCA and the DOJ. Neither party sought judicial review of this or the original SPB decision, although such decisions are subject to review in a California court by writ of mandate or writ of review (certiorari). *See* Cal.Civ.Proc.Code §§ 1067, 1068, & 1094.5 (West 1980 & Supp.1991); *Boren v. State Personnel Bd.*, 234 P.2d 981, 983, 37 Cal.2d 634 (1951).

*The Title VII Proceedings*

On November 15, 1984, while her complaint was pending before the SPB, McInnes filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII, 42 U.S.C. § 2000e–5 (1988). By waiting to file

her claim until two and a half months after initiating the SPB proceedings, McInnes complied with Title VII's requirement that where state or local law prohibits discrimination and provides procedures for obtaining relief, a person cannot file a claim with the EEOC until "sixty days after proceedings have been commenced under the State or local law." *Id.* § 2000e–5(c). On October 10, 1986, shortly after the SPB adopted the ALJ's initial ruling in favor of McInnes, the EEOC issued a Letter of Determination closely tracking the findings of the ALJ and calling upon the parties to engage in conciliation. The EEOC eventually determined that conciliation was unsuccessful. On October 28, 1987, just after the ALJ denied McInnes's modification request, the EEOC issued a "Notice of Right to Sue Within 90 Days," a prerequisite to suit under Title VII. *See id.* § 2000e–5(f).

McInnes filed her initial Title VII complaint in federal district court on January 26, 1988. In her first and final amended complaint, she alleged the same discrimination and retaliation that was at issue in the SPB proceedings. She sought injunctive relief, back pay, attorney's fees and costs, and "an order reinstating plaintiff to the position she would have occupied, or a similar position, and restoring to her the benefits she would have received, but for the discrimination and retaliation." The appellees filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, Fed.R.Civ.P. 12(b)(1) & (6), which the district court denied without prejudice. The court's order stated that the SPB decision would be binding on the parties under the doctrine of collateral estoppel,[2] and that the appellees could renew their motion to dismiss or move for summary judgment "if evidence is offered that there is no legal and/or practical steps this court can take in formulating a remedy

pursuant to Title 7 that was not invoked or enforced by the SPB." Order Denying Motion to Dismiss Without Prejudice, at 2 (June 17, 1988).

The appellees subsequently filed a motion to dismiss and/or motion for summary judgment. McInnes responded with a cross-motion for summary adjudication. Following a hearing and supplemental briefing on the preclusion issue, the district court entered summary judgment for the appellees. McInnes filed a timely appeal. We have jurisdiction under 28 U.S.C. § 1291 (1988).

## DISCUSSION

The district court entered summary judgment on the ground that both the factual and remedial determinations made by the SPB were entitled to issue preclusive effect. A grant of summary judgment is reviewed de novo. *Caldeira v. County of Kauai*, 866 F.2d 1175, 1177 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989). The availability of issue preclusion is a legal question that we also review de novo. *Id.*

■ In considering the preclusive effect of state judicial proceedings on a subsequent federal court action, we begin with 28 U.S.C. § 1738 (1988), which extends to the federal courts the principles embodied in the Full Faith and Credit Clause of the Constitution.[3] "Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982). Thus, a federal court considering whether to apply issue preclusion based on a prior state court

---

**2.** Though the district court used the traditional term "collateral estoppel," in this opinion we use the modern and equivalent term "issue preclusion." *See Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984) (discussing preclusion terminology). This case raises no question of claim preclusion.

**3.** Section 1738 provides in relevant part:

The records and judicial proceedings of any court of any ... State, Territory or Possession ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

judgment must look to state preclusion law.

In *Kremer*, the Supreme Court specifically considered the interplay between section 1738 and Title VII. The plaintiff had lost his discrimination claim before the New York State Division of Human Rights, the agency responsible for enforcing New York's anti-discrimination law. The agency's decision was affirmed by an administrative appeal board as well as the Appellate Division of the New York Supreme Court. The federal district court held that the agency decision barred the plaintiff's subsequent Title VII action as a matter of claim preclusion, and the court of appeals affirmed. The Supreme Court agreed that the Title VII claim was barred, rejecting the plaintiff's argument that Congress intended Title VII to be exempt from the requirements of section 1738. In a footnote, however, the Court noted that section 1738 and state rules of preclusion would not apply to "unreviewed administrative determinations by state agencies." 456 U.S. at 470 n. 7, 102 S.Ct. at 1891 n. 7. The Court reasoned:

> Since it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review *even if such a decision were to be afforded preclusive effect in a State's own courts.*

*Id.* (emphasis added).

Four years after *Kremer* the Court elevated this footnote to a holding, in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). The plaintiff in *Elliott* was a black university employee who, when threatened with discharge, sought a pre-termination hearing pursuant to the Tennessee Administrative Procedure Act. A university administrative assistant, presiding at the hearing as ALJ, determined that the university was not motivated by racial prejudice in discharging Elliott. Rather than seeking review of this determination in the Tennessee courts, Elliott brought suit in federal court under Title VII and 42 U.S.C. § 1983 (1988). The district court found the action precluded, but the court of appeals reversed. At the outset of its opinion, the Supreme Court noted that section 1738, by its own terms, applies to the judgments of state *courts* and not unreviewed administrative determinations. 478 U.S. at 794, 106 S.Ct. at 3223. The Court then considered whether it should fashion a federal common-law rule of preclusion. The Court held that the administrative factfinding could have issue preclusive effect with regard to the section 1983 claim.[4] However, it reached the opposite conclusion with regard to the Title VII claim, because "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." *Id.* at 796, 106 S.Ct. at 3225.

The clear teaching of *Elliott* is that in a Title VII action a prior state decision enjoys issue preclusive effect only if rendered or reviewed by a court. Under either of those circumstances, 28 U.S.C. § 1738 applies by its own terms.[5] In contrast, unreviewed administrative determinations lack preclusive effect in a subsequent Title VII action, regardless of any

---

**4.** With regard to section 1983 claims, *Elliott's* precise holding is that

> when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," [*United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)], federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

*Elliott*, 478 U.S. at 799, 106 S.Ct. at 3226. Thus, *Elliott* leaves open the question of whether an unreviewed agency decision can be given *claim*

preclusive effect in a subsequent section 1983 action. *See Gjellum v. City of Birmingham*, 829 F.2d 1056 (11th Cir.1987) (refusing to extend *Elliott's* holding to claim preclusion).

**5.** When section 1738 applies, a federal court considering whether or not a prior state court judgment is entitled to preclusive effect must refer to the law of the state in which the judgment was rendered. *Kremer*, 456 U.S. at 466–67, 102 S.Ct. at 1889–90; *see also Caldeira v. County of Kauai*, 866 F.2d 1175, 1178 (9th Cir. 1989) (same rule in context of section 1983 claim).

preclusive effect state law might accord to them. Section 1738 does not apply to such determinations, and the Court in *Elliott* refused to fashion a federal common-law rule of preclusion in the Title VII context.

■ The appellees contend, and the district court held, that the SPB is not an administrative agency but a "court" of limited jurisdiction whose decisions are entitled to preclusive effect under section 1738. In support of their contention, the appellees direct our attention to Article VII, Section 2 of the California Constitution, which establishes the SPB, and California case law that purportedly identifies the SPB as a court. *See Stockton v. Department of Employment*, 153 P.2d 741, 743, 25 Cal.2d 264 (1944). Contrary to the appellees' assertion, Article VII, Section 2 of the California Constitution does not establish the SPB as a court; it simply creates the SPB, outlines the procedures for appointment and removal of the SPB's members, and provides for election of a presiding officer and appointment of an executive officer. Nor does California case law support the appellees' position. The California Supreme Court has described the SPB not as a court but as "a statewide administrative agency." *Skelly v. State Personnel Bd.*, 539 P.2d 774, 790 n. 31, 124 Cal.Rptr. 14, 15 Cal.3d 194 (1975) (quoting *Shepherd v. State Personnel Bd.*, 307 P.2d 4, 7, 48 Cal.2d 41, 46 (1957)). *Stockton*, on which the appellees put primary reliance, is not to the contrary. *Stockton* held that SPB decisions have preclusive effect under California law, but it did not identify or describe the SPB as a court. *See Moore v. Bonner*, 695 F.2d 799, 801 (4th Cir.1982) (unreviewed state administrative decision is not state court decision within meaning of section 1738 merely because state courts would give it preclusive effect).

■ A more fundamental flaw in the appellees' argument is its failure to recognize that federal law, not state law, ultimately governs the question of what constitutes a "court" within the meaning of section 1738. Section 1738 is a federal statute, and as such its interpretation is a matter of federal law. *Porter v. Nossen*, 360 F.Supp. 527, 528 (M.D.Pa.1973) (citing *Adam v. Saenger*, 303 U.S. 59, 64, 58 S.Ct. 454, 457, 82 L.Ed. 649 (1938)). Section 1738 requires the federal courts to follow state preclusion law under certain circumstances—for example, when a prior judgment has been rendered by a state court and is sufficiently authenticated—but whether the conditions for preclusion exist is a question of federal law. We look to state law to identify the attributes and functions of an entity, and the state's characterization of the entity is entitled to some deference, but federal law ultimately determines whether the entity is a court for purposes of section 1738. *Cf. Austin v. State Indus. Ins. System*, 939 F.2d 676, 678 (9th Cir.1991) (whether entity is state agency entitled to eleventh amendment immunity is question of federal law, though state law's characterization of entity is entitled to deference).

■ The SPB certainly enjoys adjudicatory or quasi-judicial powers. For example, the SPB can hold hearings, as it did in considering McInnes's complaint. Cal. Gov't Code § 18670 (West Supp.1991). It also has a limited power to subpoena witnesses. *Id.* § 18672. However, that the SPB has these powers does not make it a court. Such powers are common to many administrative agencies, including the New York State Division of Human Rights, the state agency whose decision was at issue in *Kremer*. *See* N.Y.Exec.Law § 295(7) (McKinney 1982) (granting agency powers to hold hearings, subpoena witnesses, and require document production). The appellees' claim that the SPB is a court because it possesses adjudicatory powers is even more severely undercut by the Supreme Court's recent decision in *Astoria Federal Savings and Loan Association v. Solimino*, —— U.S. ——, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). In *Solimino*, the Court held that an unreviewed decision of the New York State Division of Human Rights lacked preclusive effect in an action brought under the Age Discrimination in Employment Act of 1967, based on the rule established by *Elliott* "in the closely parallel context of Title VII." 111 S.Ct. at 2170.

*Solimino* thus implicitly holds that an entity with powers much like those of the SPB is an administrative agency and not a court.

■ We also note that the SPB's functions and powers are not exclusively quasi-judicial. The SPB is responsible for enforcing California's civil service code and prescribing probationary periods and classifications. Cal. Const. art. VII, § 3(a); *see Fair Political Practices Comm'n v. California State Personnel Bd.*, 143 Cal.Rptr. 393, 396, 77 Cal.App.3d 52 (1978). The SPB has authority to conduct investigations and inspections in furtherance of its enforcement responsibilities. Cal. Gov't Code § 18670 (West Supp.1991). The SPB's executive officer is in fact the administrator of the civil service laws. Cal. Const. art. VII, § 3(b). Furthermore, SPB decisions are reviewable in California superior courts pursuant to a writ of mandate, not direct appeal, and are reviewed primarily for excess of jurisdiction, abuse of discretion, and substantial evidence. *See* Cal.Civ.Proc. Code § 1094.5(b) & (c) (West Supp.1991); *Barber v. State Personnel Bd.*, 556 P.2d 306, 310–11, 134 Cal.Rptr. 206, 18 Cal.3d 395 (1976); *Boren v. California State Personnel Bd.*, 234 P.2d 981, 983, 37 Cal.2d 634 (1951). These are not the characteristics of a court. Rather, the SPB is much like a federal agency that has administrative as well as adjudicative powers and whose actions and decisions are similarly reviewed for excess of jurisdiction, abuse of discretion, and substantial evidence. *See* Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), & (E) (1988) (standards for reviewing federal administrative action); S. Breyer & R. Stewart, *Administrative Law and Regulatory Policy* 6 (2d ed. 1985) ("Most administrative agencies characteristically combine many different tools and powers."). The SPB's bureaucratic structure and specialized responsibility for California's civil service law and policy also distinguish it from the ordinary court. *See* S. Breyer & R. Stewart, *supra*, at 7. We conclude, as a matter of federal law, that the SPB is an administrative agency and not a court for purposes of 28 U.S.C. § 1738.

The appellees next contend that *Elliott* is factually distinguishable from this case because the administrative "agency" in *Elliott* was a single individual employed by the university, while the SPB is a much more formalized, sophisticated, and independent entity. However, nothing in *Elliott* suggests that it turns on the degree of informality of the proceeding or the nature of the administrative entity. To the contrary, *Elliott* establishes a bright-line rule that an administrative determination is entitled to preclusive effect in a subsequent Title VII action only if it has been reviewed by a court. *Kremer* and *Solimino* confirm this reading of *Elliott*. As noted earlier, both cases involved decisions of the New York State Division of Human Rights, an agency with the same institutional formality and independence enjoyed by the SPB. The statement in *Kremer*'s footnote and the holding in *Solimino* that unreviewed agency determinations lack preclusive effect therefore can only be read to encompass formal agencies.

■ Finally, the appellees argue that we should affirm the district court based on previous cases from our circuit in which we gave preclusive effect to decisions of California administrative agencies, including the SPB. *See Garrett v. City and County of San Francisco*, 818 F.2d 1515 (9th Cir. 1987) (San Francisco Fire Commission); *Trujillo v. County of Santa Clara*, 775 F.2d 1359 (9th Cir.1985) (California Fair Employment and Housing Commission); *Hirst v. California*, 770 F.2d 776 (9th Cir. 1985) (SPB). The appellees put particular emphasis on *Trujillo*, in which we found that a prior ruling of the California Fair Employment and Housing Commission had issue preclusive effect in a Title VII action. The Commission had ruled in favor of the complainant Trujillo, and the County successfully obtained review in California Superior Court pursuant to writ of mandate. Trujillo argued that the agency ruling should not be given preclusive effect because the appeal had been brought by the County and not by him, but we rejected his argument. The appellees claim that the holding in *Trujillo* should apply in the

present case as well, because they *could* have obtained a California court's review of the SPB decision—and thereby endowed the decision with preclusive power—regardless of McInnes's wishes.

None of our previous cases supports the appellees' position, because in every one of them the agency determination at issue had been reviewed in a California court of general jurisdiction. To adopt their approach would be to hold that unreviewed administrative decisions can have preclusive effect, as long as they are not unreviewable. This would conflict with *Elliott*. The administrative decision in *Elliott* was not unreviewable; Elliott had the right to seek review of the decision in the Tennessee courts, but instead decided to pursue his Title VII claim. *See Elliott*, 478 U.S. at 792, 106 S.Ct. at 3222. Nor was reviewability controlling in the Court's recent decision in *Solimino*. The Court in *Solimino* did not consider it relevant that the ruling of the New York State Division of Human Rights could have been reviewed. The Court refused to give the ruling preclusive effect simply because it had not actually been reviewed by a court.

 *Elliott* controls even where the Title VII plaintiff obtained some relief in the prior state proceeding and the defendants chose not to seek review in state court. As the Court acknowledged in *Solimino*, even a successful complainant might bring a subsequent federal action "when the state remedy, or its enforcement, is thought to be inadequate." *Solimino*, 111 S.Ct. at 2171. McInnes is just such a complainant.

We hold that McInnes's Title VII action is not precluded by the prior decision of the SPB.[6]

Our holding does not render the SPB decision wholly irrelevant. The SPB's factual determinations, while not preclusive, are certainly probative.[7] *See Solimino*, 111 S.Ct. at 2173 ("[S]tate administrative findings may be entered into evidence at trial."). The district court should not, however, defer to the SPB's judgment about appropriate remedies. In considering the Title VII remedies to which McInnes may be entitled, the district court should bear in mind that although it "has wide discretion in fashioning appropriate Title VII remedies, that discretion must be exercised in light of ... Congress's clear intent that district courts fashion the most complete relief possible." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1133 (9th Cir.1986). This clearly includes attorney's fees, which the SPB was not authorized to grant. The Supreme Court has noted that in Title VII actions the "court's discretion to deny a fee award to a prevailing plaintiff is narrow. Absent 'special circumstances,' fees should be awarded." *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68, 100 S.Ct. 2024, 2033, 64 L.Ed.2d 723 (1980) (internal citations omitted).

We REVERSE and REMAND for further proceedings consistent with this opinion.

---

6. The appellees suggest that we appropriately could affirm on an alternative ground, based on a footnote in the district court's order. The footnote states that "even if collateral estoppel were not to attach to the findings of the SPB, a *de novo* review of the record clearly demonstrates that the plaintiff ... has received all the rights to which she is entitled." Order, at 13 n. 6 (Aug. 21, 1989). Though the district court apparently intended this to constitute an alternative holding, it held no evidentiary hearings, made no findings of fact, and reached no conclusions of law reflecting plenary consideration of McInnes's claim. Without an adequate record, we cannot meaningfully review the purported alternative holding, and accordingly cannot affirm on that ground.

7. In its order granting summary judgment, the district court indicated that the parties "stipulat[ed] to the findings made by the SPB." Order at 11 (Aug. 21, 1989). The parties have argued vociferously about the exact effect of this stipulation. The parties apparently agree that they stipulated to the factual determinations of the SPB. However, the appellees argue that the stipulation also extends to the adequacy of the remedies ordered by the SPB, an interpretation that McInnes disputes. The district court on remand must consider the effect of the stipulation. We note only that the appellees' contention seems to defy common sense. If McInnes believed, and were willing to stipulate, that the SPB's remedies were complete and sufficient, she would have had no reason to bring her Title VII action.